[Civ. No. 4856. First Appellate District, Division One.—February 13, 1925.]

# MARY DUFFY et al., Respondents, v. ALICE DUFFY et al., Appellants.

[1] DEEDS—DELIVERY—INTENT.—It is essential to the validity of a transfer of real property that there be a delivery of the conveyance with intent to transfer the title; and the true test under which the effect of the delivery is to be determined is to ascertain whether in parting with the conveyance the grantor intended thereby to divest himself of title.

[2] ID.—DELIVERY OF TITLE—INTENT—FACT—EVIDENCE—APPEAL.— If a grantor, in parting with the conveyance, intended thereby to divest himself of title, there is an effectual delivery of the deed; if not, there is no delivery. This is a question of fact to be determined by the trial court from a consideration of all the evidence in a given case bearing upon the subject, and a finding based on conflicting evidence is conclusive on appeal.

[3] ID.—DELIVERY—EVIDENCE—INTENT—REVOCATION.—To prove an effectual delivery of a deed, evidence of manual tradition of the instrument is not enough; its delivery to or on behalf of the grantee must be with intent of presently passing title, and must not be hampered by the reservation of any right of revocation or recall.

[4] ID.—PARTING WITH DOMINION AND CONTROL OVER DEED—INTENT —EFFECTUAL DELIVERY.—Where it appears from all the circumstances that the grantor has made known his intention to irrevocably part with his dominion and control over the instrument to the end that it may presently vest title in another, the delivery is sufficient and complete.

[5] ID.—CONVEYANCE UPON CONDITION—DELIVERY—RIGHT TO RECONVEYANCE.—If an owner chooses to convey his land upon a verbal promise on the part of the grantee to reconvey on demand or upon the happening of a given contingency, he may do so; and if the delivery of his deed is regular in other respects he parts with the title, subject only to the contingent right to a reconveyance.

[6] ID.—RIGHT TO RECONVEYANCE UPON RECOVERY OF SERIOUS MALADY —VALIDITY OF DEED—EVIDENCE.—A deed to a brother and sister

---

1. Delivery of deeds, notes, 16 **Am. Dec.** 35; 58 **Am. Rep.** 289; 53 **Am. St. Rep.** 537. See, also, 8 **R. C. L.** 978; 9 **Cal. Jur.** 153.

2. Delivery of deed as question of law or of fact, note, **Ann. Cas.** 1914D, 108.

of the grantor, made and delivered upon the condition that should the grantor recover from a serious malady he would then be entitled to a reconveyance, is valid; and having unsolicited and without any suggestion on the part of the grantees limited his right to this single condition, the grantor could not capriciously and as a matter of right ask for a reconveyance upon other grounds. Nor does the fact that the conveyance was made to avoid the expense of probate proceedings, or that the grantor may have cherished the secret hope of recovery, in any manner alter the situation, since these facts are not necessarily inconsistent with an intent to presently and irrevocably pass title.

[7] ID.—QUIETING TITLE—DIVESTING OF TITLE—FINDING—EVIDENCE.—. In this action to quiet title to real property conveyed to plaintiffs by their brother against the widow of the grantor, the evidence fully sustains the finding of the trial court that the grantor by his deed divested himself of title and invested the same in plaintiffs.

[8] ID.—CONFIDENTIAL RELATION—VIOLATION OF TRUST—EVIDENCE.— In such action, where the idea of making the deed to plaintiffs originated with the grantor himself, and he took independent advice of his counsel of long standing, and the grantees (plaintiffs) knew nothing of his most natural intention to make them— his only blood relatives—the objects of his bounty until he made announcement thereof, there is no merit in the contention that there was a violation of trust and that the grantees used the confidential relation (assuming it to exist) between them and the grantor to procure the deed.

[9] ID.—EVIDENCE—HEARSAY.—In such action, assuming that statements claimed to have been made by an examining physician to the widow of the grantor relative to the grantor's physical condition were material, evidence by the widow upon the subject was mere hearsay and properly rejected.

[10] ID. — MENTAL AND PHYSICAL CONDITION OF GRANTOR — REJECTION OF EVIDENCE—ABSENCE OF PREJUDICIAL ERROR.—In such action, there was no prejudicial error in rejecting evidence which had reference in the main to the mental and physical condition of the grantor, where the trial court had fully gone into this matter, and most of the rejected statements were made more than three months subsequent to the conveyance and after the grantor had married, and such testimony was cumulative.

---

(1) 18 **C. J.**, p. 196, n. 17, p. 197, n. 21, p. 198, n. 25. (2) 4 **C. J.**, p. 883, n. 33; 18 **C. J.**, p. 197, n. 20, p. 198, n. 22, 23, 25, p. 215, n. 5. (3) 18 **C. J.**, p. 198, n. 25, p. 200, n. 40, p. 439, n. 70 New. (4) 18 **C. J.**, p. 197, n. 20. (5) 18 **C. J.**, p. 211, n. 46 New. (6) 18 **C. J.**, p. 211, n. 46 New. (7) 18 **C. J.**, p. 438, n. 62. (8) 18 **C. J.**, p. 427, n. 54. (9) 22 **C. J.**, p. 199, n. 36. (10) 4 **C. J.**, p. 1019, n. 76.

APPEAL from a judgment of the Superior Court of San Joaquin County. J. A. Plummer, Judge. Affirmed.

The facts are stated in the opinion of the court.

Louttit & Stewart for Appellants.

Daniel V. Marceau for Respondents.

TYLER, P. J.—Action to quiet title to certain real estate. The complaint is in the usual form. The defendant filed an answer and cross-complaint, in which she denied the execution and delivery of the deed under which the plaintiffs claim title, and as an affirmative defense alleged that at the time of the delivery Martin Duffy, the grantor therein, being possessed of real property of the value of about thirty-five thousand dollars, was desirous of arranging his affairs so that while he lived the property would remain his and be subject to his control, but that if he died without making further disposition thereof it would appear to have been deeded to the plaintiffs, his brother and sister, and they would inherit the same without the necessity of probating his estate, and that it was for this purpose that he executed the instrument in question; that Martin believed that the delivery of said deed would not divest him of his estate in the property, and he did not so intend to divest himself of title nor to invest plaintiffs with the same, but to exercise a right of recall at any time he saw fit; that Mary Duffy, one of the grantees named in said deed, promised to return the property therein conveyed upon the demand of the grantor, who relied upon said promise and was induced thereby and by the implicit trust and confidence he reposed in his said sister to make the aforesaid transfer of his property.

These allegations were denied by the plaintiffs in their answer to the cross-complaint.

The prayer of the cross-complaint was that it be decreed that the instrument in question, purporting to be a deed, be declared to be null and void; that plaintiffs acquired no rights by virtue thereof, and that the title of said defendant, as administratrix of the estate of Martin D. Duffy, deceased, in said property be quieted.

The case was tried before the court without a jury, and judgment rendered in favor of the plaintiffs. This is an appeal from such judgment.

There is little or no dispute as to the main facts involved in the case, and they may be summarized as follows: Martin D. Duffy for many years had been engaged in the retail liquor business at Lodi, and had accumulated a substantial fortune composed of real and personal property. The former consisted of a parcel of land in Lodi devoted to business purposes and a ten-acre vineyard situated a few miles from that town, and was worth in the aggregate about thirty-five thousand dollars, while the personal property amounted in value to about ten thousand dollars. Duffy was a bachelor and about sixty-four years of age. He had no father or mother living, but he had a brother and sister —his only blood relatives—both of whom were single and had never been married and who lived in the town of Camanche, in Calaveras County. The relationship between Martin and his brother and sister was peculiarly close and affectionate, and he visited them at frequent intervals. On December 19, 1921, Martin became seriously ill and went to Oakland for medical advice, stopping at the home of Mrs. Alice McErlane, a widow, with whom he had been on friendly terms for many years. Martin at once consulted physicians in respect to his ailment, and was advised by them that he was suffering from cancer of the throat, an operation to relieve which might prove fatal, but that without an operation his speedy death was certain. Under these circumstances he requested Mrs. McErlane to telephone to G. M. Steel, an attorney residing at Lodi, and also to his brother and sister at Camanche, requesting them to meet him in Lodi the following day, December 31st. Martin arrived at Lodi that evening with Mrs. McErlane, and was met by Miss Mary Duffy and a mutual friend, C. A. Durfey, who had taken care of his business as a bartender for about fourteen years. The following morning he called at the office of Attorney Steel and stated that he desired to make a change in his will, and also directed him to draw a deed conveying the above-mentioned real property to his brother and sister. Steel did so, and took occasion to caution Martin (as he had at a previous time) against delivering the deed,

explaining to him that if he did so the property would be beyond his control. To this warning Martin replied, ''That is all right, that is all right.'' Martin then signed and acknowledged the instrument. Immediately thereafter the parties retired to a hotel in Lodi, where, in the presence of Durfey and Alice McErlane, Martin handed the deed to his sister Mary Duffy. As to what was said at the time of the delivery there is a conflict in the testimony. Mary Duffy testified that Martin stated at that time, ''I give to you and Bill my property. If I get well you will deed back,'' to which she replied, ''Oh, yes.'' On the other hand, Mrs. McErlane's version of the remarks exchanged was that Martin said, ''I am to have it back if I want it,'' to which Mary replied, ''Certainly, Martin.'' After thus delivering the deed Martin took out the contents of a safe deposit box which he had shortly before removed from the vaults of a local bank, and which contained money, Liberty bonds, promissory notes, and memoranda of indebtedness to him, and gave them to Mary, remarking that Durfey could help her out in the collection of the notes and other indebtedness. From the hotel Martin and Mary went to the bank, where the former caused the safe deposit box to be transferred to the names of Mary and Luke W. Duffy, and handed Mary the keys. While at the bank his brother Luke arrived, and Martin informed him that he had deeded his property to him and his sister. He had reserved unto himself a few hundred dollars which he anticipated would be sufficient to take care of him through his sickness. After leaving the bank all the parties proceeded to Martin's room. In the course of the afternoon a cousin of Martin, accompanied by her husband, arrived in response to a request made by telephone to Mrs. McErlane. To them Martin stated that he had deeded his property to Mary and Luke, and wanted them to put the deed on record right away. Turning to Mary he said, ''Mary, now I am leaving you comfortable; you don't have to work up in that old postoffice,'' and he informed other relatives of what he had done. Mary, although requested by Martin to go to the county seat that afternoon in order to have the deed recorded, was unable to do so, but she sent the document by mail and it was recorded on January 10, 1922.

Other facts and circumstances tending to support the testimony of Mary Duffy as to what took place at the time of the delivery of the deed show that she received the rentals from the Lodi property and placed the same to the credit of herself and brother in a local bank; that in attempting to discuss with the grantor the leasing of this property he reminded her that it belonged to her brother and herself and that he had nothing to do with it; that upon another occasion one of the tenants of the same had consulted the grantor with reference to his lease, and the grantor advised him that the property belonged to his brother and sister. There is also testimony showing that Martin Duffy had made inquiry as to how his sister was managing her property.

After the execution and delivery of the deed in the manner above recited Martin returned to Oakland to undergo treatment. On March 7, 1922, he married Alice McErlane. On the previous day he had instructed her to telephone to one W. C. Neumiller, the county treasurer of the county of San Joaquin and an old friend, and to Mr. Steel, his attorney, asking them to attend the wedding. He likewise communicated with his brother and sister, making the same request of them. On the morning of the wedding Martin announced to his sister that he was to be married that afternoon, and inquired if she had brought the deed with her. She had not, and so informed her brother, upon which he stated that he was going to make a change, and that he was having Mr. Steel come for that purpose as he wanted Alice McErlane to have the vineyard together with two thousand dollars in cash, remarking at the same time, "It is mine, and I can do with it as I please." According to the testimony of Mary, Martin said to her, "I thought if you would let Mrs. McErlane have the vineyard you and Bill would still have the town property." Mary refused to acquiesce in the suggestion. Although she visited her brother subsequently and during his illness nothing more was said in relation to the transfer of the property, and the two remained on friendly terms as theretofore. Subsequently, on May 5, 1922, Martin made a will by which he devised the Lodi property to his brother and sister and the vineyard to his wife. On May 17, 1922, he died. His will was admitted to

probate, and his widow, Alice Duffy, was appointed administratrix with the will annexed of his estate. She thereafter qualified and letters of administration were issued to her.

On June 7, 1922, Mary and her brother, Luke W. Duffy, filed suit against Alice Duffy, individually and as administratrix, for the purpose of quieting their title to the real property in question, and it is from the judgment rendered in that suit in favor of the plaintiffs that this appeal is prosecuted by the defendant.

The trial court found, in substance, that at the time of the execution of the deed Martin Duffy was suffering from a malady which he believed would prove fatal; that he entertained at the date of the transfer and for many years prior thereto a strong affection for his brother and sister and reposed in them implicit trust and confidence. It also found him to be possessed on the day of the transfer of real property of the value of thirty-five thousand dollars, and that on such day he caused the instrument in question to be drawn and signed, acknowledged, and delivered the same to Mary and Luke W. Duffy free from any limitations, conditions, or restrictions; that prior to the execution of the deed the grantor had procured independent advice from an attorney of his own selection, and that he made the deed with intent to divest himself of title to the property and invest the same in plaintiffs; that the sole inducement for the execution and delivery of the deed was love and affection.

It is admitted by the appellant that if these findings are supported by the evidence it is idle to assail them. The portion of the findings chiefly challenged by appellant is that with reference to the execution and delivery of the deed with intent to presently invest in plaintiffs title to the property in question without condition, limitation, or restriction. In this connection it is claimed by her that the evidence, given the most favorable interpretation for the plaintiffs, establishes, contrary to the finding, that there was not an absolute delivery, and that therefore either the deed was void, or that the plaintiffs hold the title in trust for the estate, the better reasoning being that the deed is void.

[1] At the outset it may be stated that the rule is elementary that it is essential to the validity of a transfer of real property that there is a delivery of the conveyance with intent

71 Cal. App.—17

to transfer the title; and the true test under which the effect of the delivery is to be determined is to ascertain whether in parting with the conveyance the grantor intended thereby to divest himself of title. **[2]** If he did, there is an effectual delivery of the deed; if not, there is no delivery. This is a question of fact to be determined by the trial court from a consideration of all the evidence in a given case bearing upon the subject (*Kenniff* v. *Caulfield,* 140 Cal. 34 [73 Pac. 803]; *Estate of Cornelius,* 151 Cal. 552 [91 Pac. 329]; *Follmer* v. *Rohrer,* 158 Cal. 757 [112 Pac. 544]; *Stewart* v. *Silva,* 192 Cal. 405 [221 Pac. 191]), and a finding based on conflicting evidence is conclusive here (*Sherman* v. *Sandell,* 106 Cal. 375 [39 Pac. 797]; *Smith* v. *Flynn,* 64 Cal. App. 218 [221 Pac. 384]). **[3]** To prove this issue evidence of manual tradition of the instrument is not enough; its delivery to or on behalf of the grantee must be with the intent of presently passing title, and must not be hampered by the reservation of any right of revocation or recall (*White* v. *Hendley,* 185 Cal. 614 [198 Pac. 22]). **[4]** Where it appears from all the circumstances that the grantor has made known his intention to irrevocably part with his dominion and control over the instrument to the end that it may presently vest title in another, the delivery is sufficient and complete (*McCully* v. *McArthur,* 187 Cal. 199 [201 Pac. 323]).

It is claimed by the appellant that the evidence here shows that the grantor had in mind undergoing an operation, which might prove fatal, and yet, on the other hand, he might recover. It is conceded that the conclusion is indisputable that in the event the ailment from which he was suffering should prove fatal the grantor wanted his brother and sister to have his property; and that if he recovered therefrom they were not to have it. It is her contention that the entire evidence shows that pending the outcome the respondents were to have merely a semblance of title, which would save them the expense of probating the estate if the operation proved fatal. It is accordingly argued that under such a state of affairs the grantor still retained control of the *title* so that in the event of his recovery he could regain the same, and that therefore he never intended by the instrument to completely divest himself of title, having in

view that there was no absolute certainty of death resulting from his ailment. In support of this contention counsel for appellant relies upon the doctrine laid down in *Brison* v. *Brison*, 75 Cal. 525 [7 Am. St. Rep. 189, 17 Pac. 689].

In that case the plaintiff and defendant were husband and wife. The former was the owner of certain real property. He was about to visit a foreign state and was apprehensive that he might be killed, and was therefore desirous of making a will before his departure so that this property should go to his wife in the event of his death. At the same time, being influenced by his desire to save the expense of probate, and having confidence in his wife, and relying upon her parol promise that she would reconvey to him upon his return, he made a deed to her absolute in form. His apprehensions of calamity befalling him proved groundless and he returned safely, but his wife refused his request to reconvey. The court held that he was entitled to a reconveyance, the wife merely holding title to the property in trust.

Counsel has cited us to other authorities in support of his contention that as the grantor was to be reinvested with his title in the event that he recovered from his malady, the delivery was hampered by a reservation, and that therefore there was no complete delivery. They are in the main cases where deeds were delivered with no intention of presently passing title, the grantors reserving the right of dominion over the deed, to revoke or recall it. These cases are extensively reviewed in *Williams* v. *Kidd*, 170 Cal. 631 [Ann. Cas. 1916E, 703, 151 Pac. 1], and require no detailed comment. In most if not all of them the delivery was made upon condition, with an express reservation of the right to a reconveyance upon the happening of the condition upon which the instrument was delivered. In such cases there is no question that a right to a reconveyance exists upon the happening of the condition. So here, had Martin Duffy recovered from his ailment he would undoubtedly have been entitled upon demand to a reconveyance; and, in fact, plaintiff Mary Duffy testified that she was ready to execute a conveyance upon the happening of that event, and that her refusal to accede to the grantor's wishes was because the condition upon which she was to reconvey if requested had not been realized, namely, recovery from his malady.

There is a distinction between the right to recover the *deed* and the right to claim a reconveyance of the property embraced therein. To say that a promise on the part of a grantee to reconvey upon a certain contingency is the equivalent of retaining title is in effect to say that under such circumstances the grantor by his conveyance merely created a cloud upon his title. But this is not so. [5] If an owner chooses to convey his land upon a verbal promise on the part of the grantee to reconvey on demand or upon the happening of a given contingency, he may do so; and if the delivery of his deed is regular in other respects he parts with the title, subject only to the contingent right to a reconveyance. An agreement on the part of the grantee to reconvey negatives the idea of the retention by the grantor of a right to recall or revoke his deed. If it could be said that there. could be no complete delivery because of a promise on the part of the grantee to reconvey upon the happening of a certain condition, then all conveyances made upon condition would be idle acts and of no legal effect unless and until the specified contingency should come to pass. The law affords a remedy where a grantee wrongfully refuses to reconvey according to his agreement. But this is not such a case. [6] Martin Duffy never recovered from his illness, and this was the only condition upon which he would have been entitled to a reconveyance. Having unsolicited and without any suggestion on the part of the grantees limited his right to this single condition he could not capriciously and as a matter of right ask for a reconveyance upon other grounds. His property had passed from him beyond recall by the delivery of his deed, subject only to his right to a reconveyance upon the happening of the single limitation with which it was burdened. Nor does the fact that the conveyance was made to avoid the expense of probate proceedings, or that the grantor may have cherished the secret hope of recovery, in any manner alter the situation. These facts are not necessarily inconsistent with an intent to presently and irrevocably pass title (*Hefney* v. *Sealey*, 175 Cal. 20 [164 Pac. 898]).

[7] We conclude, therefore, upon this subject that the evidence fully sustains the finding of the trial court that the

grantor by his deed divested himself of title and invested the same in his grantees.

[8] Equally without merit is the further contention that there was a violation of trust and that the grantees used the confidential relation existing between them and Martin to procure the deed. There is no direct evidence that the grantees took advantage of this relation (assuming it to exist). On the contrary, the idea of making the deed originated with the grantor himself; he took independent advice of his counsel of long standing, and the grantees knew nothing of his most natural intention to make them—his only blood relatives—the objects of his bounty until he made announcement thereof.

And, finally, appellant urges some forty-one objections to rulings of the trial court upon the admission of evidence and assigns such rulings as error justifying a reversal.

[9] In this connection it is claimed that the court erred in rejecting evidence as to statements made by an examining physician relative to the grantor's physical condition. The statements were claimed to have been made by the physician to Mrs. McErlane. Assuming them to have been material, evidence by her upon the subject was mere hearsay and properly rejected.

[10] Evidence relating to the purchase of a burial plot, and the fact that deceased had telephoned to his attorney in Stockton for the purpose of making a change in his affairs, together with certain declarations in disparagement of his title, were rejected, and these rulings are assigned as error. We have carefully examined these objections, and find them to be untenable. The evidence had reference in the main to the mental and physical condition of the grantor, and this matter had been gone into fully by the trial court; the facts and circumstances surrounding the execution and delivery of the deed and its purpose, including the grantor's apprehension of impending death, were also all before the court, and most of the rejected statements were made more than three months subsequent to the conveyance and after the grantor had married. Moreover, the testimony was cumulative, and we are clearly of the opinion that its rejection in no manner affected or invaded the substantial rights of the appellant.

From what we have said it follows that the judgment should be and it is hereby affirmed.

St. Sure, J., and Knight, J., concurred.

A petition by appellant to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on April 13, 1925.